# APRIL TERM, 1909.*

CITY OF MASON *v.* LANSING & JACKSON RAILWAY CO.

1. RAILROADS—STREETS—MUNICIPAL CORPORATIONS — FRANCHISES
—STATUTES.

A railroad organized under 2 Comp. Laws, §§ 6223 et seq., may
construct a section of an interurban electric railway, within
city limits, on private right of way and crossing city streets,
without obtaining a franchise from the municipality, al-
though the purpose of organizing the steam railway com-
pany was to avoid the necessity of accepting a right of way
offered by the city, which the interurban company consid-
ered too circuitous and expensive. McALVAY, J., and BLAIR,
C. J., dissenting.

2. STREET RAILWAYS—FRANCHISES—REGULATION.

It is only when a street railway is operated along the streets
of a municipality that conditions and limitations may be
imposed by the common council. McALVAY, J., and BLAIR,
C. J., dissenting.

3. RAILROADS—LENGTH OF LINE—STATUTES.

No restrictions as to length of steam roads are imposed by
chapter 164, 2 Comp. Laws.

4. SAME—ELECTRIC OPERATION—STATUTES.

Railroads organized under chapter 164, 2 Comp. Laws, may oper-
ate all or parts of the line by electricity. McALVAY, J., and
BLAIR, C. J., dissenting.

Appeal from Ingham; Wisner, J., presiding. Sub-
mitted January 19, 1909. (Docket No. 109.) Decided
May 26, 1909.

Bill by the city of Mason against the Lansing & Jack-
son Railway Company, the Michigan United Railways
Company, the Lansing Southern Railroad Company, and

* Continued from Vol. 156.

the Northern Construction Company to enjoin the construction and operation of a railway.    From a decree dismissing the bill, complainant appeals.    Affirmed.

*Louis B. McArthur* (*Lawton T. Hemans* and *Otto Kirchner*, of counsel), for complainant.

*Sanford W. Ladd* and *Arthur J. Tuttle* (*Stevenson, Carpenter & Butzel*, of counsel), for defendants.

MOORE, J.  The complainant is a municipal corporation incorporated under the provisions of Act No. 178, Laws 1873, by Act No. 277, Local Acts 1875, reincorporated by Act No. 272, Local Acts 1891.  The defendants the Lansing & Jackson Railway Company and the Michigan United Railways Company are domestic corporations organized and incorporated under the provisions of an act to provide for the formation of street railway companies, the same being chapter 168 of the Compiled Laws of 1897, as amended.  The defendant the Northern Construction Company is a domestic corporation organized under the provisions of Act No. 232, Pub. Acts 1903, and the defendant the Lansing Southern Railroad Company is a domestic corporation incorporated under Act No. 198, Laws 1873; this act being what is known as the "steam or commercial railroad act."

Some time prior to the month of February, 1905, Myron W. Mills, George G. Moore, and James R. Elliott, associated with other gentlemen, became the owners of the street railway system in the city of Lansing.  In the month of February, 1905, these men made application to the common council of the city of Mason for a franchise for the construction through the city of Mason of a street or interurban railway which they purposed to construct from the city of Lansing through the city of Mason to the city of Jackson.  They presented a franchise to the common council of the city of Mason.  The common council refused to grant the franchise desired.  On the 30th of March, 1905, Myron W. Mills, George G. Moore, James

R. Elliott, the three gentlemen heretofore named, together ·
with David W. Mills, executed articles of incorporation
for the Lansing & Jackson Railway Company, which
were filed in the office of the secretary of State; the pur-
pose of this organization, as stated in its articles of in-
corporation, being—

"To construct, purchase, lease, own, maintain, use and
operate street railways, in, through, upon and along
private rights of way, streets, roads, alleys and highways
in cities and villages and extending through and from
cities and villages into adjoining townships and in,
through, upon and along private rights of way, streets,
roads, alleys and highways in townships in the State of·
Michigan, and especially the cities of Lansing and Jack-
son and the townships, villages and cities between said
cities."

Following the organization of this corporation, it,
through its officers, Myron W. Mills, George G. Moore,
and James R. Elliott, executed a map of that portion of
its proposed route from the southern corporate limits of
the city of Lansing to the northern corporate limits of the
city of Mason.   This map was approved August 15, 1905,
and filed in the office of the register of deeds for the
county of Ingham.

At or about this time the Lansing & Jackson Railway
Company contracted with its officers, Messrs. Myron W.
Mills, George G. Moore, and James R. Elliott, for the
construction of the road upon the line designated in their
map, and to facilitate the construction the contractors
secured options upon and purchased further right of way
both to the north and south of the city of Mason and pro-
cured franchises from townships and from the village of
Leslie and made frequent application to the common
council of the city of Mason for a franchise through said
city, and during the year 1905 constructed some six or
eight miles of roadbed.   No franchise was granted by
the common council of the city of Mason because the par-
ties were unable to agree as to the street to be occupied

by said company. On or about the 31st of March, 1906, James R. Elliott and others united in the incorporation of the defendant the Michigan United Railways Company; the purpose of this corporation, as set forth in article 2 of its articles of association, being "to construct, purchase, lease, own, maintain, use and operate street railways" through various designated sections of the State and over certain designated routes, among which was the following:

"From the city of Lansing, Ingham county, and through the city of Mason and the village of Leslie to the city of Jackson."

Of this company Myron W. Mills became president, James R. Elliott vice president and treasurer, and George G. Moore a director, and later Theron W. Atwood became a director. On or about May 25, 1906, James R. Elliott and others effected the organization and incorporation of the defendant the Northern Construction Company. Of this company Theron W. Atwood soon became president, a position he has since continued to occupy.

Some time in June, 1907, Messrs. Mills, Moore, and Elliott, who had contracted for the construction of the road with the Lansing & Jackson Railway Company, sublet the contract for construction to the Northern Construction Company. During the summer of 1907 the construction begun by Messrs. Mills, Moore, and Elliott was practically completed, and a street or interurban railway connecting with the street railway system of the city of Lansing extended to the north corporate limits of the city of Mason. While this work was in progress, Mr. Atwood made frequent overtures to the common council of the city of Mason for a franchise for the construction of such road through the city upon a line which the officers and agents had surveyed and marked; Mr. Atwood finally saying to the officers of the city that, unless a franchise was granted to the Lansing & Jackson Railway Company to construct the road where they desired to con-

struct it, they would force its way through the city without a franchise. Following such representations, and the survey of the line through the city of Mason, Mr. Theron W. Atwood, James R. Elliott, and others, officers and agents of the defendant companies, organized the defendant company the Lansing Southern Railroad Company; the articles of association being filed in the office of the secretary of State on the 11th day of September, 1907. The purpose of the organization of said company, as stated in article 5 of its articles of incorporation, being to construct a railroad of T-rails, standard gauge, near the center of northeast one-quarter of section 6 of the township of Vevay, in the county of Ingham, State of Michigan; thence in said township of Vevay to a point about 350 feet south and 58 feet east of the northwest one-quarter of section 16 of the township of Vevay—which railroad is to be operated by electric power. The total length of said line being 2.36 miles. On the same day that the Lansing Southern Railroad Company filed its articles of incorporation, it filed its map of its proposed route through the city of Mason. Said route was over a private right of way, but near the route demanded by the Lansing & Jackson Railway Company and connecting the termini of the Lansing & Jackson Railway Company at the northern and southern corporate limits of the city of Mason. At once after the organization of the Lansing Southern Railroad Company the defendant, the Northern Construction Company purchased right of way within the city of Mason and proceeded to grade and construct a railway connecting with the Lansing & Jackson Railway into the city of Mason. At this juncture the bill of complaint was filed in this cause. After a hearing upon the merits, the bill of complaint was dismissed. The case is brought here by appeal.

It is the claim of complainant that what is attempted to be done is to construct and operate a street and suburban railway, in fact, and that the organization of the Lansing Southern Railroad Company under the general

railroad act is a mere evasion for the purpose of getting through the city of Mason without a franchise from the common council. We quote from the brief of counsel:

" It is the contention of the complainant: That there is generic difference between what in law is comprehended under the term ' street or interurban railway ' and what is understood by 'steam or commercial railway;' that the legislature's providing the two means of incorporation is a recognition not only of the difference inherent in the services they render, but a difference in the supervision and control which the State extends over them. This distinction, although sometimes difficult to phrase in words, is nevertheless recognized in many adjudicated cases"—citing cases to be found in the brief.

" The language is positive and certain showing that it was in the mind of the legislature that no company or corporation should ever obtain the benefits of a street railway business unless they ' shall be organized under the provisions of this act.' * * * It is the characteristics and purposes of a road, and not the statute under which a company may seek to incorporate, that must fix the kind of a road that is in fact being constructed. * * * Whatever may be the claim of the Lansing Southern Railroad Company, they are building and proposing to build within the city of Mason the same kind of a railway, proposing to build it in the same place, to equip it with the same kind of equipment, and propose the same kind of service over it, as the Lansing & Jackson Railway Company have asked a franchise to build, equip, and furnish service over. Now the law is well settled that the right of a municipality under the statute, to refuse its consent to the use of its streets by a street railway, is an absolute one, and its power in the first instance to impose conditions is unlimited. Now that street railways can be constructed upon private right of way the power of the municipality still continues and can be enforced by injunction "—citing cases found in the brief.

It is later argued by one of the counsel for the city that such a road as is proposed to be built by the Lansing Southern Railroad Company cannot legally be built by a company organized under the general railroad law. We quote from the brief:

"Such a railroad may not be constructed under the general railroad law. It may be constructed and operated only under the street railway law, and under that law the streets of the municipality may not be crossed without its consent. The language of section 13 of the street railway act, as amended, already referred to, seems to place the proposition beyond doubt. Other sections of the act are in harmony with it. * * * I submit that it is too plain for argument that a railroad that crosses a street is literally 'in' the street. May a company organized under the street railway law that has acquired a private right of way within a city cross the streets of that city without its consent?"—and counsel answers the question in the negative.

Counsel for defendants insist they are authorized by the law to do what is proposed by them to be done.

The following conclusions are fairly to be drawn from the record:

(1) It was proposed and expected to build and operate a line of road between the city of Lansing and the city of Jackson through the city of Mason by a company organized under the street and suburban railway act.

(2) That an effort was made to get a franchise through the city of Mason upon a street that would make a route that would be comparatively direct, and that would make it unnecessary to cross the tracks of the Michigan Central Railroad, a steam road.

(3) The common council of the city of Mason was willing to grant a franchise, but insisted upon the line being laid lengthwise of one of its principal business thoroughfares. This involved a more circuitous route than the one desired by defendants, and necessitated the crossing of a steam road twice. At least one of said crossings must be made by an overhead bridge, involving a large expense at the outset, and a continuing expense during operation, to say nothing of the delay and danger of the crossings.

(4) Under this situation the defendants, regarding the conditions insisted upon by the common council as too onerous, decided to abandon the operation of a street railway through the city of Mason upon the streets of said city, and to get their cars through the city upon a private right of way, without laying any track lengthwise of the

street.    To accomplish this result the organization of the
Lansing Southern Railroad Company was brought about
as before stated.

The question, then, is whether what is proposed may be
legally done?    The case is one of first impression.    The
diligence of able counsel has not enabled them to call our
attention to an authority which is decisive.    Our attention
is called to the case of *Pennsylvania R. Co.* v. *Bridge-
port R. Co.* (Pa.), 11 Montg. Co. Law Rep. 73.    A ref-
erence to the case will show that it is readily distinguish-
able from the case at bar.    Section 6223, 2 Comp. Laws,
provides in part as follows:

"That it shall be lawful for any number of persons,
not less than seven, to organize themselves into a corpora-
tion for the purpose of constructing, operating and main-
taining a railroad," etc.

Section 6232 provides for the making, the approval, and
the filing of a map.    The provisions of both of these sec-
tions have been followed.    Section 6234 provides: "Every
such corporation shall possess the general powers and be
subject to the liabilities and restrictions following, that is
to say:" Subdivision 1 of this section relates to the mak-
ing of surveys.    Subdivision 2 authorizes the corporation
to receive voluntary grants of real estate and other prop-
erty.    The next subdivision authorizes the purchase of
real estate and other property.    Subdivision 5 reads in
part as follows:

"To construct its road upon or across, or its railroad
tunnel under any stream of water, watercourse, private
road, street, lane, alley or highway, and across or under
any plank road, railroad or canal, which the route of its
road or railroad tunnel shall lie along, or intersect.    *    *    *
And in case of the construction of such railway upon any
public street, lane, alley or highway the same shall be on
such terms and conditions as shall be agreed upon between
the railroad company and the common council of any city,
or the village board of any village, or the commissioners
of highway of any township in which the same may be;
but such railway shall not be constructed upon any pub-

lic street, lane, alley, highway or private way until damages and compensation be made by the railroad company therefor to the owner or owners of property adjoining such street, lane, alley, highway or private way, and opposite where such railroad is to be constructed either by agreement between the railroad company and each owner or owners, or ascertain as herein prescribed for obtaining property or franchises for the purpose of its incorporation to be paid to the owner thereof, or deposited as hereinafter directed."

Subdivision 6 reads as follows:

"To cross, join and unite its railroads with any other railroad now or hereafter constructed under any law whatever at any point on its route, and upon the grounds of such other railroad now or hereafter constructed with the necessary turnouts, sidings, and switches, and other accommodations and conveniences, in furtherance of the objects of its connections; and to make all such business arrangements as said companies may agree upon. And every company whose railroad shall be intersected by any other railroad shall unite with the owners of such other railroads in forming such intersections and connections and grant facilities for the same as hereinafter provided."

Subdivision 7 reads in part as follows:

"To take, transport, carry, and convey persons and property on their said road or through such tunnel by the force and power of steam, animals, or any mechanical power, or by any combination of them, and to receive tolls and compensation therefor."

A careful reading of the act will fail to disclose any such limitation upon the powers of the company as is contained in the Pennsylvania statute, to which attention was called in the case of *Pennsylvania R. Co. v. Bridgeport R. Co., supra.*

It is not stated that the road must be any particular length, nor that it must run through more than one municipality or township. It is only when the track is laid upon the street or highway that terms and conditions may be imposed by the common council. It was doubtless competent for the legislature to impose other restrictions,

but it has not done so. It is a matter of common knowledge that, in nearly every city of any size, belt lines of road are constructed and operated under the provisions of the law which we have quoted, when the length of the line is quite as short as the line of the Lansing Southern road. We have recognized the legality of the operation of some of these lines. *City of Detroit* v. *Railroad*, 149 Mich. 530 (113 N. W. 365); *Ilgenfritz* v. *Railway*, 136 Mich. 634 (99 N. W. 878); *Attorney General, ex rel. City of Monroe,* v. *Railway,* 151 Mich. 473 (115 N. W. 422).

There can be no doubt, if the defendants had organized under the general law and acquired private right of way, it might have operated its cars from Lansing to Jackson running through the city of Mason as it now proposes, using electricity as the motive power. If it may do this, why may not it operate part of the distance under the general railroad law over its private right of way? We find nothing in the statute which prevents it from so doing.

The decree is affirmed.

GRANT, MONTGOMERY, OSTRANDER, and BROOKE, JJ., concurred with MOORE, J.

HOOKER, J. Complainant has appealed from a decree dismissing an injunction bill. The defendant corporation the Lansing & Jackson Railway Company was organized under the street railway law (2 Comp. Laws, chap. 168) to construct an electric railway between Lansing and Jackson, through the intervening townships, cities, and villages. It is already constructed between Lansing and the city of Mason and is nearing completion between Jackson and Mason. The common council denied its right to construct its line through the city of Mason, unless it would use the main business street upon terms and restrictions which it has been unwilling to accede to. It therefore proposed to run its line through the city, west of the Michigan Central Railroad (thereby avoiding two expensive crossings) upon a private right of way. The council denied this

right, and thereupon defendant procured the organization of a railroad company, the Lansing Southern Railroad Company, under the general railroad law (2 Comp. Laws, chap. 164), to build a road through the city upon a private right of way which it has since acquired. It is obvious and not denied that this was done to enable defendant to run through cars between Lansing and Jackson over said road, in defiance of the wishes and action taken by the common council of the city of Mason.

The Mason people are naturally desirous of obtaining the construction of this road through the main business street of the city, and we understand that a right to do this was and would be again offered if acceptable. The defendants, however, are unwilling to do this because of the necessary expense of two costly crossings of the Michigan Central Railroad, a difficult grade, and a deflection of its line, increasing its length.

Whether a council may unreasonably require the construction of a road through a particular street to the exclusion of all others, we need not inquire, as the defendants do not raise the question by attempting the use of another street. Neither is it necessary to determine whether its requirements are unreasonable, for the same reason. The question here is whether the defendant Lansing & Jackson Railway Company has the right to put its own road, or to procure one to be built under the general railroad law, through the city, without the consent of the city.

The original street railway act was passed in 1867. See Act No. 35, Laws 1867. There can be little doubt that it contemplated only the running of cars by animal power, in the streets of cities and villages and the adjacent townships. There have been important amendments to this act since, however, which have extended the powers of companies since organized under this law. Thus Act No. 12, Pub. Acts 1893, authorized the extension and construction of such roads in the highways in townships generally. See Act No. 234, Pub. Acts 1901, and Acts Nos. 101 and 133, Pub. Acts 1905. The latter

act is an amendment to section 13. It authorized any corporation organized under the street railway act to build and operate a railway upon the streets of cities and villages and in and along the streets and highways of townships, but only upon such terms and conditions as the municipal authorities shall require. It then provides that—

"Any such company may construct, use, maintain, and own a street railway upon private rights of way, and all companies shall, when necessary to enter upon and use private property in such construction and operation, have the same power and right of eminent domain as is now possessed by railroad companies."

The use of animal power for street railways had become obsolete, and electricity had been almost universally applied to them before 1905, with the consequent application to country as well as city use of the trolley car. At first they continued to be used in and along the highways, but this practice required consent and permitted restriction, if not possible prohibition by local boards. The act of 1905 relieved the roads from the necessity of building in the streets and highways and allowed the use of a private right of way. It is contended that they are not relieved of the necessity of getting the consent of local authorities for the reason that they must still cross streets and country roads, which is a building upon streets and highways requiring consent of local authorities. Act No. 101, Pub. Acts 1905, provides that no such company shall construct a road "in, upon, above or under" the lines of streets and ways in a city without consent; but this language does not appear in the later act, i. e., Act No. 133, passed 10 days later, which amended the same section. But we need not rest this case on a narrow ground. The amendments of these statutes show a recognition of the necessities of changed conditions. Street railways, so-called, are no longer mere creatures of city convenience. They have expanded into necessary conveniences of suburban and interurban traffic, as essential to public convenience

in their way as steam railroads are in another way. We see nothing to indicate that the legislature intended to cripple them by giving authority to localities to block their way by refusing the privilege to cross their territory. They are no longer obliged to be street railways, in fact (*i. e.*, in the sense that they must be confined to the streets and highways), but, like other railroads, may own their rights of way, and we have no difficulty in holding that the necessary crossing of streets and highways was a right intended to be conferred as it is under other railway acts. In short, the authority is given to build such roads, where street railway companies can acquire private rights of way by purchase or condemnation, and, like other railroads, they do not need the consent of local boards, unless they wish to lay their tracks in and along streets or highways.

We do not overlook the case of *Detroit United Railway v. Paper Co.*, 149 Mich. 675 (113 N. W. 285). In that case a village had permitted the use of the east 30 feet of a street for a distance of 1,000 feet to be used for the erection of a trestle upon which petitioner's track was laid. Subsequently, by virtue of an ordinance not published as the law required, petitioner claimed the right to use this 30-foot strip together with a 90-foot strip from defendant's lands, which it sought to condemn, for the purpose of an embankment. The authority of the village to authorize an embankment was denied, and the validity of the proceedings was questioned upon several grounds. The opinion in that case recognized the validity of both acts, viz., No. 101 and No. 133. We feel constrained to overrule so much as was said upon that subject, as it was clearly erroneous. The authorities are practically unanimous in holding that:

" Where an act or portion of an act is amended 'so as to read' in a prescribed way, it has been said that the section amended is entirely repealed and obliterated thereby. It is perfectly clear that, as to all matters contained in the original enactment, and not incorporated in

the amendment, the latter must be held to have the effect of a repeal." Endlich on Interpretation of Statutes, § 196, citing: *Moore* v. *Mausert*, 49 N. Y. 332; *People* v. *Board of Sup'rs of Montgomery Co.*, 67 N. Y. 109 (23 Am. Rep. 94); *State* v. *Ingersoll*, 17 Wis. 631; *Goodno* v. *City of Oshkosh*, 31 Wis. 127; *Mosby* v. *Insurance Co.*, 31 Grat. (Va.) 629; *Goodall* v. *People*, 123 Ill. 389 (15 N. E. 171); *State* v. *County of Duval*, 23 Fla. 483 (3 South. 193)."

We approved the same doctrine in *People* v. *Hiller,* 113 Mich. 211, citing 23 Am. & Eng. Enc. Law (1st Ed.), p. 488, where many authorities are collected.

Section 25, art. 4, of our late Constitution (in force when these acts were passed), provides that "no law shall be revised, altered or amended by reference to its title only; but the act revised and the section or sections of the act altered or amended shall be re-enacted and published at length." See *People* v. *Pritchard*, 21 Mich. 241; *Tuskaloosa Bridge Co.* v. *Olmstead*, 41 Ala. 9; Cooley on Constitutional Limitations (7th Ed.), pp. 215, 216. This requirement clearly implies that the re-enacted section is a substitute for the amended section, as indicated in Cooley on Constitutional Limitations (7th Ed.), p. 216. In *People* v. *Pritchard, supra*, it was said:

"It seems that section 2463 of the Compiled Laws [1857], which governs the case, had previously been amended by another statute, and the effect was, it is claimed, to repeal the section as it stood in the Compiled Laws, leaving the amendatory statute to stand instead thereof. And the argument is that a subsequent amendatory statute could not properly be entitled 'An act to amend section 2463 of the Compiled Laws [1857],' because there was no longer any such section, and an act thus entitled could have nothing to operate upon. This reasoning seems to us too refined for practical value. Under our Constitution the mode of amending a section of a statute is by enacting that the section in question 'shall read as follows.' The position of the section in the original statute is not changed, and there is no reason why subsequent amendments of the same section should not be made by reference to its number in the original statute."

We conclude, therefore, that this street railway had the right to go through Mason upon its own private way and to cross the streets subject to such rights of regulation as the law confers upon the city and railway commissioner. It was not necessary to organize under the general law to accomplish this, but we do not see that the fact that it has caused this to be done has created any equities in favor of complainant.

The decree dismissing the bill is affirmed, with costs.

McALVAY, J. (*dissenting*).  Defendant Lansing & Jackson Railway Company is a Michigan corporation organized under the street railway law—

"To construct, purchase, lease, own, maintain, use and operate street railways in, through, upon and along private rights of way, streets, roads, alleys and highways in cities and villages, and extending through and from cities and villages into adjoining townships and in, through, upon and along private rights of way, streets, roads, alleys and highways in townships in the State of Michigan and especially the cities of Lansing and Jackson and the townships, villages and cities between said cities."

Defendant Michigan United Railways Company is organized under the same law for the same purposes. The territory over which its operations may extend is larger and is claimed by lease or otherwise to be operating the last-named defendant.  Defendant Lansing Southern Railroad Company is a Michigan corporation organized under the general railroad law of the State for the purpose of constructing, operating, and maintaining a railroad 2.36 miles in length.  Defendant Northern Construction Company is also a Michigan corporation organized under Act No. 232, Pub. Acts 1903 "to construct and equip street railways and interurban railways." Defendant Lansing & Jackson Railway Company, in pursuance of its purpose to construct and operate a street railway between Lansing and Jackson, obtained its private right of way through townships between said cities and is constructed for practically the entire distance outside the

limits of the complainant city of Mason. Extended nego-
tiations between the city authorities and the officers and
agents of this defendant, relative to granting it a permit
to enter its limits and construct its street railway across
its territory, resulted in a refusal on the part of the street
railway company to accept the terms and conditions
offered by complainant.

These defendant corporations are all organized, owned,
and operated in the same interests, each being officered by
the same persons or by officers and agents of the others,
except perhaps the Michigan United Railways. The
active agent of defendant Lansing & Jackson Railway
Company, at the time it was seeking this franchise, stated
to the mayor of the city of Mason that if a franchise was
not granted they would get through without one. De-
fendant Lansing Southern Railroad was then organized.
It is practically all within the corporate limits of Mason
and passes through upon the line the street railway com-
pany desired. Its north and south termini coincide with
the termini of the two sections of defendant Lansing &
Jackson Railway Company at or about the northern and
southern limits of complainant corporation, and it is laid
out to be connected with them and within the city to sup-
ply the link in this street railway as it passes through,
thus completing the street railway line of the defendant
last named from Lansing to Jackson. The purpose of
this defendant is to have the street car passengers of the
Lansing & Jackson Railway Company carried over its
line in the cars without change into and through com-
plainant city, making but one stop at a place provided
therefor. It is admitted that the building of a street
railway through this city was abandoned because they
were not willing to submit to the terms imposed by com-
plainant, and they now propose to get through by build-
ing a railroad under the general railroad law and operate
it for this purpose, as they claim they are legally entitled
to do. Proceeding upon this theory, after organizing
under the general railroad law, the defendant Lansing

Southern Railroad Company secured its right of way through the city of Mason, and the construction company was proceeding to construct its road thereon through the city, crossing 11 streets, without consent or permission of the municipal authorities.

The bill of complaint was then filed, and defendants were enjoined. It is the contention on the part of complainant: That the organization of the Lansing Southern Railroad Company is a subterfuge, not a good-faith proceeding; that the use of the general railroad laws is a fraudulent use; that the sole purpose of such organization is to carry on a street railway business within complainant's corporate limits, and avoid the regulations and restrictions imposed upon street railways by law, when in truth and in fact it is a part of the Lansing & Jackson Railway Company; and that the organization for such purpose is a fraud upon the statute. Complainant also contends that, the purpose of this defendant being to carry on a street railway business, such purpose is not within its corporate power.

It cannot be claimed that the municipality was not strictly within its rights in imposing such terms as it saw fit as a condition to granting a franchise to the Lansing & Jackson Railway Company. This court has so held, and has said that a municipality may absolutely refuse the use of its streets to a street railway. These decisions have never been questioned. *City of Monroe* v. *Railway*, 143 Mich., at page 320 (106 N. W. 704), and cases cited. The demands of the municipality, whether considered reasonable or unreasonable by the street railway company, cannot be used as an argument excusing or warranting an unlawful attempt to get through said city by the street railway company.

In considering the statutes under which general railroads and street railways may be organized, the legislative intent is clear that the street railway act was intended for street railways only. Can we say of the general railroad law that there is either an express or an im

157 MICH.—2.

plied intent that corporations were to organize under it for the purposes of conducting a street railway business? Street railways are of modern growth, and, except as operated by animal power, were unknown at the time the general railroad law was enacted. This general railroad law, by reason of the business in which corporations organized under it were intended to engage, and the manner in which said business by its terms was to be conducted, is not adaptable to street railway business, which, from its very nature, must be subject to the restrictions and under the control of the municipality in which such business is to be carried on. Such use of a general railroad cannot be said to have been within the fair intendment of the statute. This court has distinguished between street railways and general railroads in several cases, and such distinction has been drawn from their purposes and uses rather than from the statutes under which they had been incorporated. *Grand Rapids, etc., R. Co.* v. *Heisel*, 38 Mich. 62 (31 Am. Rep. 306); *Township of Ecorse* v. *Railway*, 153 Mich. 393 (117 N. W. 89), and cases cited.

There is an important distinction created by statute between street railway and general railroad corporations. No authority is given to a street railway company to enter a municipality and construct and operate its road in, upon, along (or across) its streets or highways without permission of the proper authorities. The word "across" is not in the statute, but a street railway is not permitted to operate at all within corporate limits without such permission. Specific authority is given to a company organized under the general railroad law to construct its road across any street or highway. By amendments to the street railway law, the right was given to extend such railways, having obtained proper consent, into the streets and highways of a township adjacent to a city or village, and later to construct through any township with the consent and upon the terms required by the township authorities. By Act No.

133, Pub. Acts 1905, power was given street railways to exercise the right of eminent domain by proceedings the same as under the general railroad laws; but in none of these amendments is there any repeal of the required permission of city, village, or township authorities.

One distinction between street railways and general railroads recognized by the courts was that the former relieved the congested traffic upon the streets, and was therefore not an additional servitude. The urban and interurban street railways are merely the extension of street railways beyond city and village limits and have been permitted upon the streets and highways of townships for the same reason. Granting power to these roads to build upon private rights of way does not take them out of their classification as street railways and out of municipal control. Whether they own parts or the whole of their rights of way, they must be classified by the business they are engaged in, and the law under which they should be organized is the street railway law. There is no other law providing for the organization of street railway companies. Street railways always have been, and of necessity always must be, subject to control and regulation by municipal authority. Operated upon its own right of way through a city, a street railway presents dangers to the public as necessary to be guarded against as when in the open street. To hold that the statute permitting such roads to own and occupy private rights of way, by implication, repealed the provisions of law requiring municipal control over street railways, is unwarranted and unsupported by authority. If such is to be the holding of this court it will be the first time that such a construction has been placed upon an amended statute. The rule which we have heretofore followed has been that repeals by implication are not favored, and are only allowed when the implication is a necessary one. The evolution in urban and suburban transportation, and the power used, is recognized, and must be taken into consideration; but such

improvements, instead of operating to put aside the reasonable control of its agencies provided by law, and necessary for the safety of the citizen, should operate to add to the care and control of the authorities by reason of added dangers.

The defendants did not contend for the construction last above stated, but they merely suggested it. Such construction practically worked out would reach results extremely complicated. A street railway crossing a city might be constructed partly on its right of way and partly in the streets. For several blocks the city could impose regulations, then for a distance no control, and so alternating for greater or lesser distances. The grant of the right of eminent domain was not extended to street railways to relieve them from supervision and control, but doubtless to secure such roads which were at that time building on private rights of way immunity from being obstructed by objecting owners. See *Grand Rapids, etc., R. Co.* v. *Stevens,* 143 Mich. 646 (107 N. W. 436).

The conclusion is that municipal control over street railways continues under the street railway law, and was not repealed by the amendment of 1905, and that whether a street railway within corporate limits is operated "in and upon the lines of streets and ways" or upon its private right of way through the municipality, crossing streets and ways, it may be there only under such conditions as may be imposed by the municipality. This evidently was the practical construction put upon this amendment by defendants who proceeded to organize defendant Lansing Southern Railroad Company under the general railroad law, and cross the city practically on the line where it was desired to run the street railway. It is not denied that this was the reason for organizing this defendant company, or that the purpose is to make it the link through complainant city of the street railway line of the Lansing & Jackson Railway Company. The purpose is to lease this line to be used to carry on a street railway business. There is no claim made that the Lansing Southern Railroad Com-

pany intends to equip its road, less than 2½ miles long, for the purpose of carrying on a general railroad business. Defendants declare that to use this road as herein stated their intention is to use it, is a proper and legitimate use.

Under the circumstances herein related, the general railroad law was resorted to, and defendant Lansing Southern Railroad Company was organized. The project was conceived by the same agent of the street railway company who threatened to go through the city without permission. He outlined the plan, agreed to and did pay all expenses, including 5 per cent. of stock subscriptions required by law, agreed that subscribers would lose nothing, and thus secured their signatures. The record clearly shows that this was a subterfuge, a dishonest organization, and a fraud upon the statute. There can be little room for differences of opinion upon this proposition, after a careful study of this record. Defendants in this manner sought to accomplish by indirection that which they could not do directly. Courts cannot permit undertakings like this to succeed, and upon this ground complainant should have been granted relief.

The other contention of complainant that it is not within the corporate power of defendant to engage in the street railway business must also be considered. It is the first time the question has been squarely before this court. From what has already been said in this opinion, the position that will be taken upon this question may be readily inferred. Were it not for the fact that it is urged that the business this defendant proposes to engage in is a general railroad business which could be done by it if disconnected from the street railway, and therefore that the intent and purposes of the other defendants and the organizers of this road are immaterial, it would be unnecessary to consider further the nature of the business this defendant is to engage in. The question is not what such a company under certain circumstances might do, and it is not urged that it might operate and maintain a street rail-

road.   It is urged, as already stated, that this is a general
railroad business within the general railroad law.   What
it proposes to do, as stated in this opinion, is gathered
from the admissions of defendants and the undisputed
evidence.   The position taken by defendant that it is not
to be operated as a street railway is not tenable.   On
account of the physical facts it cannot be maintained.   It
is to be set in as an integral part of a continuous line of
street railway from Lansing to Jackson, operated by one
street railway corporation, which can only perform those
acts within the corporate powers of a street railroad.
Defendant company's road will be so situated that it can-
not receive any other than street railway business.   It
seeks to avoid this inevitable conclusion by asserting that
within complainant corporation but one stop will be made
where passengers may enter and leave the cars.   This
does not meet the situation, nor fix the classification of
this business.   Nor is any such proposition of any binding
effect upon this defendant.   It will occupy its own right
of way, and, if it may lawfully engage in this business, it
may determine for itself and its convenience that a stop
should be made at each street crossing.   If the munici-
pality may not regulate and control this traffic, who can
interfere with this defendant from carrying out such a
program ?

The length of this railroad, or that it is wholly with-
in corporate limits, is not determinative of this ques-
tion, nor that other roads organized under this law have
within cities engaged in business.   In every such case the
business has admittedly been a general railroad business,
or a business incident thereto, and in no instance has the
question here raised been discussed or the corporate power
of such roads been questioned.   We are referred to no case
similar to the case at bar, nor have we been able to find
any.   Whatever indications have been incidentally made
in any opinions of this court are against the proposition
that it is within the corporate powers of general railroads
to maintain and operate street railways.

This case is one of very great importance, and the results of a decision in favor of defendants' contention would be far reaching. The wisdom of the legislature in providing separate statutes for two classes of roads cannot be questioned, and the legislative intent to continue such separation is apparent. Over one class the municipality is given plenary powers to regulate and control. The other class is for the most part under general control of State authorities. These relations to the municipality and the State have become well known, and the operation of these laws has in general been satisfactory. It would be neither just nor wise for the courts by construction to change the well-settled policy of the State. If general railroads may engage in street railway business, how may courts distinguish which class of roads imposes an additional servitude, when within streets and highways? Certainly no municipal control could be imposed upon general railroads.

The conclusion is that it is not within the corporate power of a general railroad to engage in street railway business or lease or permit its road to be used for such purpose. The bill of complaint is drawn upon the theory that a court of equity would restrain the commission of the acts charged as unlawful and unauthorized, and threatening a continuing trespass. A court in equity without doubt has jurisdiction to determine the rights of the parties in this case. No collateral attack is made upon the corporate organization. The question involved upon this branch of the case is a question of corporate power. That such question may be tried in a collateral proceeding has been held by this court. *Orr* v. *Lacey*, 2 Doug. (Mich.) 230; *Joy* v. *Plank Road Co.*, 11 Mich. 155; *Grand Rapids Bridge Co.* v. *Prange*, 35 Mich. 400 (24 Am. Rep. 585); *Day* v. *Buggy-Co.*, 57 Mich. 146 (23 N. W. 628, 58 Am. Rep. 352); *Detroit City Ry.* v. *Mills*, 85 Mich., at page 648 (48 N. W. 1007), and cases cited. Where property rights of individuals are invaded by the *ultra vires* acts of corporations, equity will interfere by

injunction. Case last cited, *supra*; 29 Am. & Eng. Enc. Law (2d Ed.), p. 80, citing *Delaware, etc., Canal Co.* v. *Railroad Co.*, 16 N. J. Eq. 321.

The decree of the court below should be reversed, and a decree entered granting a perpetual injunction as prayed.

BLAIR, C. J., concurred with McALVAY, J.